2009 ME 100

**Sharon McPHEE**

v.

**MAINE STATE RETIREMENT SYSTEM, Joanne McPhee, Intervenor.**

Supreme Judicial Court of Maine.

Argued: May 21, 2009.
Decided: Sept. 22, 2009.

See also 904 A.2d 401.

Janet T. Mills, Attorney General, Christopher L. Mann, Asst. Atty. Gen. (orally), Office of Attorney General, Augusta, ME, attorneys for the Maine State Retirement System.

Terry W. Calderwood, Esq. (orally), Gibbons & Calderwood, Camden, ME, attorney for Joanne McPhee.

Roger J. Katz, Esq., Keith R. Varner, Esq. (orally), Lipman, Katz & McKee, P.A., Augusta, ME, attorneys for Sharon McPhee.

Panel: ALEXANDER, LEVY, SILVER, MEAD, and GORMAN, JJ., and CLIFFORD, A.R.J.*

LEVY, J.

[¶ 1] This case presents a unique question of statutory construction: whether a statutory directive that the terms of a Qualified Domestic Relations Order (QDRO) be given their "plain meaning" means that a QDRO should be construed in a manner that is contrary to the meaning of the terms as defined in the statute that authorizes the qualification of the QDRO. Because we answer this question in the negative, we vacate the judgment of the Superior Court (Kennebec County, Jabar, J.), and reinstate a decision of the Board of Trustees of the Maine State Retirement System (MSRS) that the MSRS continue to pay the survivor retirement benefits of John McPhee, who is deceased, to his surviving spouse, Joanne McPhee, and not to Sharon McPhee, from whom John was divorced.

## I. BACKGROUND

[¶ 2] John and Sharon McPhee were married in 1960. During the marriage, they owned two corporations that operated wilderness sporting camps, and John was also employed as a game warden pilot with the Department of Inland Fisheries and Wildlife from 1962 until he retired on August 18, 1985. In June 1985, John applied to receive service retirement benefits[1] from the MSRS[2] and chose a Special Plan option whereby his "surviving spouse" would receive any benefits upon his death.

---

* Clifford, J., sat at oral argument and participated in the initial conference while he was a Justice, and, on order of the Chief Justice, was authorized to continue his participation in his capacity as Active Retired Justice.

1. As may be inferred from the service retirement benefits statutes, currently codified at 5 M.R.S. §§ 17851–17858–B (2008), in general, service retirement benefits are those benefits received by a member who completes a specified number of years of creditable service and subsequently retires.

2. The Maine State Retirement System has since been renamed the Maine Public Employees Retirement System (Maine PERS),

*See* 5 M.R.S.A. § 1121(1)(D) (Supp.1984) currently codified, with subsequent amendments, at 5 M.R.S. § 17852(5)(B) (2008).[3] John and Sharon divorced in 1993. Their divorce judgment provided that Sharon "shall receive one-half of [John]'s pension, including survivor benefits."[4] Pursuant to the divorce judgment, a Qualified Domestic Relations Order (QDRO) was submitted to the MSRS, for approval, and was subsequently entered by the court in February 1994.

[¶ 3] Paragraph five of the QDRO which addresses Sharon's right to receive payments for "service or disability retirement benefits" and "death or survivor benefits" from the MSRS is at the center of the current dispute:

Alternate Payee [Sharon] is awarded and shall receive from the System a portion of each distribution of service or disability retirement benefits (whether payable to member or retiree or a beneficiary) and death or survivor benefits (including distribution of the remaining balance of member's or retiree's accumulated contributions paid as a death benefit) if, as, and when such distributions are made as provided by the System's governing laws and rules based on

member's or retiree's membership in, credit with, or contributions to the System.

Sharon began receiving payments from the MSRS for her one-half share of John's service retirement benefits shortly thereafter. In 1996, John married Joanne.

### A. The buy-out agreement

[¶ 4] In 2002, Sharon and John entered into a buy-out agreement by which Sharon relinquished her shares of stock in the parties' corporations and released any claims she had against John and the corporations. The agreement specifically provided that John "shall continue to be obligated to pay to Sharon one-half of his pension, including survivor benefits, through the Maine State Retirement System, as he is paying to her at present."

[¶ 5] John died in a plane crash in May 2003. Soon thereafter, the MSRS stopped paying benefits to Sharon and began paying benefits to Joanne. Under the Special Plan option elected by John when he retired, upon his death benefits could only thereafter be paid to his "surviving spouse." *See* 5 M.R.S. § 17852(5)(B). Pursuant to the second paragraph of 5 M.R.S. § 17852(5)(B),[5] if a member is di-

---

but for consistency purposes we shall continue to refer to it as the Maine State Retirement System (MSRS) in this opinion. *See* P.L. 2007, ch. 58, § 1 (effective Sept. 20, 2007) (codified at 5 M.R.S. § 17101(2) (2008)).

**3.** Title 5 M.R.S.A. § 1121(1)(D) (Supp.1984) was repealed and replaced by P.L.1985, ch. 801, §§ 2, 5, and 7 (effective Jan. 1, 1987). The relevant section describing the benefit to be received by the surviving spouse has since been amended several times, most pertinently by P.L.1993, ch. 387, § A–12 (effective June 17, 1993) (codified in the second paragraph of 5 M.R.S. § 17852(5)(B) (2008)).

**4.** The relevant provision states:

5. Plaintiff shall receive one-half of Defendant's pension, including survivor benefits,

through the Maine State Retirement System, payable either in a lump sum of one-half of its present value, or in monthly installments payable directly from the Maine State Retirement System. Defendant agrees to take all necessary steps to ensure the transfer of pension benefits to Plaintiff as set forth above, prior to the culmination of the divorce.

**5.** This definition of surviving spouse was added to section 17852(5)(B) by P.L.1987, ch. 652, §§ 2, 4 (effective Aug. 4, 1988). However, the Public Law included a provision stating that it would apply "to the determination of spousal benefits in a case where a member retired prior to September 30, 1985, but dies after September 30, 1985," and therefore was applicable at the time the McPhees created their QDRO in 1994, because John retired

vorced, the term "surviving spouse' ... means the person legally married to the officer at the time of the officer's death." At the time of his death, Joanne was legally married to John.

## B. The First Lawsuit

[¶ 6] In 2004, Sharon brought suit against John's Estate and Joanne as its personal representative for breach of the buy-out agreement stemming from the estate's failure to continue to pay benefits to her after John's death.[6]

[¶ 7] On appeal, we determined that, regardless of any potential ambiguities between the QDRO and the divorce decree, the subsequent buy-out agreement was a valid and enforceable contract and obligated John's Estate to pay survivor pension benefits pursuant to the terms of the divorce decree. *See Estate of John M. McPhee*, 2006 ME 38, ¶¶ 8–9, 904 A.2d 401, 403. As a result, we held that the Estate and Joanne, as personal representative of the Estate, were liable for breach of contract, and ordered the Estate to pay money to Sharon in the amount equal to the amount of the MSRS benefits then being paid to Joanne. *Id.* ¶ 9, 904 A.2d at 403. Our opinion noted that "we need not decide whether the provisions of the QDRO served to amend" the divorce judgment. *Id.* ¶ 9 n.2, 904 A.2d at 403.

## C. Legislative Developments

[¶ 8] While the first appeal was pending before us, the Legislature enacted L.D. 1850, "An Act To Clarify the Change of Beneficiary Provision in the Maine State Retirement System Laws." L.D. 1850 (122nd Legis.2006); P.L.2005, ch. 560, §§ 1–5 (effective Aug. 23, 2006) (codified at

5 M.R.S. §§ 17054(4), 17059(6)(A), 17805–A(1), and 18405–A(1) (2008)). L.D. 1850 amended portions of the MSRS laws governing qualified domestic relations orders. In particular, title 5, section 17054(4) was amended to establish that the rights of a beneficiary or other payee are subject to the rights of an alternate payee named in a QDRO (revisions are shown in legislative format):

> The rights of a member ~~or~~, *retiree, beneficiary or other payee* under this Part are subject to the rights of or assignment to an alternate payee under a qualified domestic relations order in accordance with section 17059.

Section 17059(6)(A) was also amended to require the MSRS to give effect to QDROs in accordance with their plain meaning:

> A. If the order is determined to be a qualified domestic relations order, ~~the~~ *it is presumed to be in compliance with all requirements of this Part. The* retirement system shall pay benefits in accordance with the order *and shall give effect to the plain meaning of its terms notwithstanding any failure of the order to cite or reference statutory or rule provisions. A beneficiary or recipient of a right or benefit provided for or awarded in a qualified domestic relations order may not be deprived of that right or benefit, or any part of that right or benefit, by a subsequent act or omission of the member, another claimant or beneficiary or the retirement system, notwithstanding any provision of law to the contrary or any policy or procedure the retirement system employs in the implementation of this Part.*

prior to 1985 and did not die until after 1985. P.L.1987, ch. 652, § 4.

**6.** Although Sharon named the MSRS as a defendant in the complaint, her claims

against the MSRS were dismissed with prejudice by stipulation. *See* 5 M.R.S. § 17059(2) (2008).

[¶ 9] These amendments to sections 17054 and 17059 were made effective retroactive to January 1, 1985. P.L.2005, ch. 560, § 5.

### D. Subsequent Administrative Action and Appeals

[¶ 10] After the enactment of L.D. 1850, Sharon requested that the MSRS pay her benefits pursuant to the QDRO and the newly amended statutes. The Executive Director of the MSRS denied Sharon's request, concluding that the retirement benefits were properly being paid to Joanne. Sharon appealed this decision to the MSRS's Board of Trustees. Prior to the hearing, the MSRS notified Joanne that her rights might be affected by the appeal, and she was subsequently granted leave to intervene.

[¶ 11] A hearing on Sharon's administrative appeal took place before a hearing officer, who recommended in a report that the decision of the Executive Director be overturned. However, the Board ultimately rejected the hearing officer's recommendation and affirmed the Executive Director's determination. In its decision, the Board noted that the QDRO contained specific provisions that directed that it be interpreted in accordance with MSRS statutes and regulations. The Board also noted that 5 M.R.S. § 17852(5)(B) "grants the 'surviving spouse' of a retired game warden the benefits both Sharon and Joanne claim[, and that w]hen, as was the case with John McPhee, the retired game warden was divorced subsequent to retirement, 'surviving spouse' means 'the person legally married to the officer at the time of the officer's death.'" In addition, the Board found support in its own rules that provide that when a QDRO is entered subsequent to a member's retirement, "the benefit amount to be paid to the survivor will be that required under the option elected by the retiree at retirement, as though no qualified domestic relations order had existed." 12 C.M.R. 94 411 103–7 § 15(B)(1) (1994).

[¶ 12] The Board reasoned further that the statutory amendments resulting from L.D. 1850 did not control its decision because the statute governing benefits awarded to the "surviving spouse" of an Inland Fisheries and Wildlife officer, 5 M.R.S. § 17852(5)(B), was more specific.[7] The Board also concluded that even if the amendments enacted by L.D. 1850 applied to the case, Sharon could not prevail because there was no statutory authority for transferring the interest of a deceased officer's surviving spouse to another person at the time the QDRO was approved in 1994. Thus, the Board held that the QDRO could not transfer the "spousal benefits to anyone other than the person to whom [the retiree] would be legally married at the time of his death." Overall, the Board concluded that it would be absurd to construe the amended statutes "so that the agreement of signatories to a QDRO supercedes whatever else may be required by statute, rule or case law."

[¶ 13] Sharon appealed the decision to the Superior Court. The court vacated the Board's decision, concluding that the amendments enacted by L.D. 1850 were clear in their directive to give effect to the "plain meaning" of a QDRO, and that, contrary to the Board's reasoning, the newly amended statutes could be read harmoniously with existing MSRS laws. It concluded that the amended statutes "plainly contemplate[d]" that Sharon should be the survivor beneficiary of John's benefits. The MSRS's motion for

---

7. We disagree with this view and conclude that section 5 M.R.S. § 17059(6)(A) (2008), as amended by L.D. 1850, is applicable. However, because this disagreement is inconsequential, we do not dwell on this portion of the Board's opinion in our analysis.

reconsideration was denied. Both Joanne and the MSRS appeal from this decision.

## II. DISCUSSION

[¶ 14] We review a decision of the Board directly and questions of statutory interpretation de novo. *Kane v. Comm'r of the Dep't of Health & Human Servs.*, 2008 ME 185, ¶ 12, 960 A.2d 1196, 1200. A party wishing to overturn the Board's decision bears the burden of persuasion on appeal. *See Zegel v. Bd. Of Soc. Worker Licensure*, 2004 ME 31, ¶ 14, 843 A.2d 18, 22.

[¶ 15] At issue in this case is section 17059(6)(A), as amended by L.D. 1850. Sharon contends that the amendments to section 17059(6)(A) demonstrate the Legislature's intent that the "plain meaning" of a QDRO be given effect without regard to any contrary MSRS statutory requirements. Thus, the plain meaning of the term "death or survivor benefits" as employed in the QDRO is that she was the intended recipient of *any benefits* awarded by the MSRS after John's death, regardless of any statutory provisions to the contrary.

[¶ 16] By contrast, the MSRS contends that regardless of the amendments enacted by L.D. 1850, the "death or survivor benefits" referenced in the QDRO do not refer to or affect the surviving spouse benefits now being paid to Joanne. Instead, the plain meaning of "death or survivor benefits" is found in the MSRS's governing statutes as meaning those benefits awarded to a member's beneficiary if a member dies prior to retirement. Therefore, because John was already retired by the time the parties created the QDRO, no "death or survivor benefits" could ever have been awarded to anyone and the inclusion of those terms in the QDRO was surplusage. From this it follows that when John elected the Special Plan at his retirement in 1985, the only person who would ever be eligible to receive his service retirement benefits after his death was his surviving spouse, if he had one at the time of his death, and that person is Joanne.

[¶ 17] To analyze these claims, we consider: (A) the role of QDROs in the distribution of retirement benefits after a divorce; (B) the effect of the amended section 17059(6)(A) on the construction of QDROs; and (C) the application of section 17059(6)(A) to the McPhee QDRO. We conclude that as between divorced spouses, the MSRS's responsibilities are determined solely with reference to the QDRO within the context of its own statutory authority and regulations, and that the plain meaning of the term "death or survivor benefits" as employed in the McPhee QDRO is the meaning unambiguously ascribed to it by the MSRS statutes that authorize those benefits. Accordingly, we vacate the judgment of the Superior Court and remand for an order affirming the Board's decision.

A. The Role of QDROs in the Distribution of Retirement Benefits After a Divorce

[¶ 18] In general, the right of a public employee to any kind of benefit under the MSRS may not be assigned. *See* 5 M.R.S. § 17054 (2008). However, the statute contains several exceptions to this general rule, one of which is that "[t]he rights of a member, retiree, beneficiary or other payee under [the MSRS] are subject to the rights of or assignment to an alternate payee under a qualified domestic relations order in accordance with section 17059." 5 M.R.S. § 17054(4). Thus, because state retirement benefits are normally non-transferable, when a divorce court seeks to divide one party's MSRS retirement benefits as part of a divorce judgment, as was the case between Sharon and John McPhee, it is not enough

to indicate the same in the divorce judgment. To successfully effectuate a transfer and initiate the payment of benefits directly from the MSRS to the receiving party, known as the "alternate payee," the parties must import the relevant terms of the divorce judgment into a domestic relations order and submit it to the MSRS for a determination as to whether it is qualified. *See id.;* 5 M.R.S. § 17059(1) (2008).

[¶ 19] Section 17059 generally governs the qualification and implementation of QDROs. 5 M.R.S. § 17059 (2008). Section 17059(1) establishes that the executive director of the MSRS, or the executive director's designee, "has exclusive authority to determine whether a domestic relations order is . . . qualified."[8] 5 M.R.S. § 17059(1).

[¶ 20] Once a proposed QDRO is received, the statute does not charge the executive director with determining whether it squares with the intent of the parties or the divorce court as expressed in a separate settlement agreement or divorce judgment, and explicitly prohibits the MSRS from being made a party to the divorce action. *See* 5 M.R.S. § 17059(2). Rather, the executive director's duty is a narrow one: to determine whether the QDRO meets specific statutory criteria set forth in 5 M.R.S. § 17059(4) and (5). These criteria include the requirements that the QDRO be sufficiently specific concerning the exact division of benefits, 5 M.R.S. § 17059(4)(B), and that the QDRO "not require the retirement system to provide a type or form of benefit or an option

not otherwise provided by the retirement system." 5 M.R.S. § 17059(4)(E).[9] The statute makes no provision, however, for the MSRS to assess a proposed QDRO in relation to the related settlement agreement, divorce judgment, or other documents.

 [¶ 21] If a party disputes a decision of the MSRS regarding the qualification of a proposed QDRO, the party may appeal to the Board in a proceeding separate from the divorce judgment, or may petition the divorce court that issued the order to amend the order so that any deficiencies can be corrected and the order may become qualified. *See* 5 M.R.S. §§ 17059(6)(B), 17451 (2008). Exclusive authority to modify and enter a QDRO rests with the divorce court. *See Jed–Harbage v. Harbage,* 2003 ME 74, ¶¶ 11–13, 825 A.2d 348, 352–53 (concluding that while the divorce judgment was ambiguous, the QDRO was not and was more in line with the terms of the 401(K) plan it distributed); *see also Greenwood v. Greenwood,* 2000 ME 37, ¶ 9, 746 A.2d 358, 360 ("If the divorce judgment is ambiguous, *the court* has the inherent and continuing authority to construe and clarify its judgment. . . .") (quotation marks omitted, emphasis added).

**B. Section 17059(6)(A)**

 [¶ 22] It is in this statutory context that, after the QDRO has been qualified, section 17059(6)(A), as amended, then directs the MSRS to "pay benefits in accordance with the order and give effect to

---

8. In general, the MSRS statutes define a domestic relations order as:
 a judgment, decree or order, including approval of a property settlement agreement, that:
 A. Relates to the provision of child support, alimony payments or marital property rights to a spouse, former spouse, child or other dependent of a member or retiree; and

B. Is made pursuant to a domestic relations law of this State or another state.
5 M.R.S. § 17001(12–A) (2008).

9. A domestic relations order can only be found to be "qualified" if it meets additional enumerated requirements contained in the statute and regulations. *See* 5 M.R.S. § 17059(4), (5) (2008); 12 C.M.R. 94 411 103–4 to –5 § 9 (1994).

the *plain meaning* of its terms notwithstanding any failure of the order to cite or reference statutory or rule provisions." 5 M.R.S. § 17059(6)(A) (emphasis added). Thus, a QDRO's failure to explicitly cite the statute or rule authorizing a specific benefit or payment does not affect the qualification of the QDRO. However, while a QDRO's failure to cite a statute or rule may be of no consequence, the very language of section 17059(6)(A) presumes that governing "statutory or rule provisions" actually exist, and the only way the MSRS could have qualified such an order would have been with reference to benefits as authorized by a statute or rule. In addition, once a QDRO is entered by a court, the rights or benefits payable to an alternate payee may not be deprived "by a subsequent act or omission of the member, another claimant or beneficiary or the retirement system, notwithstanding any provision of law to the contrary or any policy or procedure" of the retirement system. 5 M.R.S. § 17059(6)(A). This aspect of section 17059(6)(A) does not speak to how a QDRO should be construed, but instead regulates the effectiveness of a QDRO after it has been entered by protecting the rights and benefits vested in the alternate payee from later acts or omissions of others.

■■■ [¶ 23] Statutory construction is a holistic process: we "construe the whole statutory scheme of which the section at issue forms a part so that a harmonious result, presumably the intent of the Legislature, may be achieved." *Liberty Ins. Underwriters, Inc. v. Estate of Faulkner,*

2008 ME 149, ¶ 15, 957 A.2d 94, 99. Looking at section 17059(6)(A) from the perspective of the statutory scheme as a whole, it is clear that the "plain meaning" of the terms in a QDRO should not be divorced from the meaning of the terms ascribed by the statute or rule that permitted the QDRO to be qualified in the first place. This principle would be circumvented if, as Sharon contends, once a QDRO became qualified, terms in the QDRO were to then be given a meaning independent of and potentially in conflict with the statutes and rules governing the QDRO. Construing the statute as a whole, section 17059(6)(A) does not support the view that the "plain meaning" of a term in a QDRO should be divorced from the plain meaning of the term as it is employed in the statute or rule authorizing the benefit.

### C. Application to the McPhee QDRO

■■■ [¶ 24] The McPhee QDRO awarded Sharon:

a portion of each distribution of *service or disability retirement benefits* (whether payable to a member or retiree or a beneficiary) and *death or survivor benefits* (including distribution of the remaining balance of member's or retiree's accumulated contributions paid as a death benefit) if, as, and when such distributions are made as provided by the System's governing laws and rules based on member's or retiree's membership in, credit with, or contributions to the System.

(Emphasis added).[10] Sharon contends that the "plain meaning" of the terms "death or

**10.** In addition, paragraph six of the QDRO contains the provisions relating to the applicable requirements discussed above governing qualification. This paragraph states in pertinent part,

The Maine State Retirement System is directed to disburse to Alternate Payee the portion of distributions assigned under Paragraph No. 5 of this Order, if, as, and

when such distributions are made as provided by the System's governing laws and rules ... subject to the following provisions:

(a) This Order shall not be interpreted in any way to require the System to provide any type or form of benefit or any option not otherwise provided under the System's governing rules.

survivor benefits" are any benefits relating to John that would be distributed after his death. By contrast, the MSRS and Joanne argue that "death or survivor benefits" are specific statutory terms that refer to benefits that would have been available if John had died prior to receiving any retirement benefits, and do not refer to the "surviving spouse" benefits now being paid to Joanne. For the reasons that follow, we adopt the position of the MSRS and Joanne.

[¶ 25] The applicable statute governing "ordinary death benefits" leaves no doubt that "death or survivor benefits" refer to those benefits that are available "if a qualifying member dies before the member's service retirement benefit becomes effective." 5 M.R.S. § 17953 (Supp.1993) (describing "ordinary death benefits").[11] As an alternative to "death benefits," a "survivor benefit," as described in subsection 17953(2), may be elected instead. *See* 5 M.R.S. § 17953(2). Thus, the "death or survivor benefits" cited in the McPhee QDRO refer to a specific class of benefits that would have been available if John had died before receiving his service retire-

. . . .

(f) This Order shall not be interpreted to require the designation of a particular person as the recipient of benefits in the event of member's or retiree's death or to require the selection of a particular benefit payment plan or option. However, notwithstanding the provisions of this Order, if Alternate Payee is designated as a beneficiary for any benefits payable by MSRS upon the death of member or retiree, then Alternate Payee shall receive such payment to which she is entitled by law as beneficiary. . . . If Alternate Payee is not designated as a beneficiary for such benefits, Alternate Payee shall receive the portion specified in Paragraph No. 5 above applied to the benefits payable to the specified beneficiary.

. . . .

(i) The interest of Alternate Payee is governed by 5 MRSA §§ 17059 et seq., or its successor statute.

ment benefit. They do not refer to the right of a surviving spouse to receive the continued payment of one-half of a retiree's service retirement benefit upon the death of the retiree.

[¶ 26] Under the Special Plan elected by John at his retirement in 1985, "the *surviving spouse* is entitled to a retirement benefit that is 1/2 of the amount being paid at the time of the officer's death. The payment must continue for the remainder of the surviving spouse's lifetime." 5 M.R.S. § 17852(5)(B) (emphasis added). This benefit is not part of the ordinary death benefits or survivor benefits, described in 5 M.R.S. § 17953(1), (2), but rather appears in the provision related to "Service Retirement Benefits." *See id.* At the time John made his election, the terms of the Special Plan specifically indicated that the designation was immutable. Moreover, statutory authority for transferring these particular benefits from the "surviving spouse" to an alternate beneficiary under this plan was not enacted until 1997, three years after entry of the McPhee QDRO.[12]

11. This section has since been amended in ways not material to our discussion here.

12. In 1997, after the McPhee QDRO had been qualified, subsection C was added to section 17852(5):

C. Notwithstanding paragraph B, the benefit to which a surviving spouse is entitled under paragraph B may be awarded in whole or in part to another person or persons under a domestic relations order that is determined to be a [QDRO] under section 17059 and, when so awarded, the benefit must be distributed in accordance with the qualified domestic relations order.

P.L.1997, ch. 396, § 2 (effective Sept. 19, 1997) (codified at 5 M.R.S. § 17852(5)(C) (2008)).

[¶ 27] As noted by the Board in its decision, the MSRS also has a rule, applicable to the parties, that states in pertinent part: "Upon the death of . . . the retiree . . . the benefit amount to be paid to the survivor will be that required under the option elected by the retiree at retirement, as though no qualified domestic relations order had existed." 12 C.M.R. 94 411 103–7 § 15(B)(1). The MSRS rules also contain an explanatory basis statement, adopted in November 1993,[13] that is directly relevant to the McPhee QDRO:

> A consequence of these [1993] amendments [to the regulation] is to change the effect of an alternate payee's interest in payments to a named beneficiary other than the alternate payee under an option choice or beneficiary designation made at retirement, where the alternate payee's interest is paid as a portion of a service retirement benefit and the QDRO is post-retirement. Parties whose divorce, retirement, and QDRO are closely related in time need to recognize that the alternate payee's interest as alternate payee in these circumstances does not survive the retiree's death to affect payments to a beneficiary other than the alternate payee. The sequence in which divorce, retirement and a QDRO occur has implications for the apportionment of the parties' interests.
>
> Finally, it is important to recall that the purpose of the QDRO statute is to provide a mechanism for the payment of benefits as apportioned by the parties, not to ensure the fairness of the apportionment which it implements.

12 C.M.R. 94 411 103–11 (Basis Statement).

[¶ 28] It is thus apparent that even if John and Sharon had specifically stated in their QDRO that they wished to transfer the "surviving spouse" service retirement benefit to Sharon, there would have been no statutory authority for doing so and the order would not have been qualified. In this regard, and contrary to Sharon's contention, section 17059(6)(A)'s directive that an alternate payee "may not be deprived of [a] right or benefit, by a subsequent act or omission" is inapplicable. Sharon was never awarded, nor could she have been awarded, the surviving spouse benefit in the QDRO when it was entered in 1994.

[¶ 29] Because John had retired before the QDRO was approved, "death and survivor benefits" were not available, and it is fair to infer that the use of those terms in the QDRO was likely in the nature of boilerplate language. This inference is supported by the terms in the QDRO that precede "death and survivor benefits." The preceding language directs that Sharon shall also receive any "disability retirement benefits." Pursuant to statute, "a member qualifies for a disability retirement benefit if disabled while in service." 5 M.R.S. § 17924(1) (Supp.1993).[14] Neither Sharon nor anyone else could ever have been eligible to be assigned disability retirement benefits for John because he was already retired at the time the QDRO was prepared, just as no person could be assigned death or survivor benefits.

[¶ 30] It is apparent that the plain meaning of the terms used in the QDRO might conflict with John and Sharon's intent as reflected in the terms of their buy-out agreement and the original divorce judgment. In our prior opinion we noted, that such an ambiguity might exist, but did not resolve it. *Estate of McPhee*, 2006 ME 38, ¶ 9 n. 2, 904 A.2d at 403. However, we also recognized that "[i]n 2002,

---

13. The amended QDRO was submitted by the McPhees and qualified by the MSRS in March 1994.

14. This section has since been amended in ways not material to our discussion here.

when Sharon and John entered into the buy-out agreement, Joanne, John's soon-to-be 'surviving spouse,' was destined to receive his survivor pension benefits." *Id.* ¶ 8, 904 A.2d at 403. We concluded that the buy-out agreement itself was an enforceable contract that allowed Sharon to recover the equivalent amount of the service retirement benefits that Joanne is now receiving from the MSRS. *Id.* ¶¶ 8–9, 904 A.2d at 403. Thus, the buy-out agreement may have been premised on a mutual mistake by John and Sharon as to the effect their QDRO had had on the benefits that could be paid to Sharon under the Special Plan option.

[¶ 31] Although a mutual mistake may explain the conflict between the QDRO and the buy-out agreement, the controlling statutes do not authorize the MSRS to disregard the plain meaning of the terms used in the QDRO based on what the parties to the QDRO might have intended "survivor benefits" to mean. Within the context of the laws governing the MSRS, the term "death or survivor benefits" unambiguously refers to the death and survivor benefits authorized in section 5 M.R.S. § 17953. Section 17059(6)(A), as amended, does not direct or authorize the MSRS to look beyond the four corners of a QDRO to determine the underlying intent of the parties. It would defeat the purpose of QDROs to require the MSRS to "qualify" not only QDROs, but also the related divorce judgment and written agreements.[15]

[¶ 32] Sharon also argues that the legislative history of L.D. 1850 establishes that the Legislature intended the amendments to directly address and control her case. We disagree. While it is undisputed that Sharon's former attorney wrote a letter to the chairs of the Joint Standing Committee on Labor concerning Sharon's plight during the period when other parts of the resulting amendments were being considered, the resulting legislation and committee notes do not mention Sharon or her case. The summary of the bill, as reported by the Committee states:

> In order to clarify that the terms of qualified domestic relations orders must be followed in implementing the laws governing the Maine State Retirement System, this amendment specifies that the rights of a beneficiary or other payee under the laws governing the Maine State Retirement system are subject to the terms of a [QDRO], provides that a [QDRO] is presumed to be in compliance with all applicable requirements and directs the Maine State Retirement System to give effect to the plain meaning

---

15. It has been aptly noted in the related setting of ERISA:

> The point is that by giving a plan participant a clear set of instructions for making his own instructions clear, ERISA forecloses any justification for enquiries into nice expressions of intent, in favor of the virtues of adhering to an uncomplicated rule: simple administration, avoiding double liability, and ensuring that beneficiaries get what's coming quickly, without the folderol essential under less-certain rules.
>
> And the cost of less certain rules would be too plain. Plan administrators would be forced to examine a multitude of external documents that might purport to affect the dispensation of benefits.

*Kennedy v. Plan Adm'r for DuPont Sav. and Inv. Plan,* —— U.S. ——, —— – ——, 129 S.Ct. 865, 875–76, 172 L.Ed.2d 662 (2009) (quotation marks omitted). The issue presented in Kennedy was whether a retirement plan administrator should be forced to abide by a purported federal common law waiver in a divorce decree when "that waiver [wa]s inconsistent with plan documents." *Id.* at 870. The Court concluded that imposing such a duty "would destroy a plan administrator's ability to look at the plan documents and records conforming to them to get clear distribution instructions, without going into court" and force the administrator "into factually complex and subjective determinations." *Id.* at 876.

of the terms of such an order despite any failure of the order to cite or reference statutory or rule provisions. The amendment makes these changes retroactive to January 1, 1985.

L.D. 1850, Statement of Fact (122nd Legis.2006). This summary gives no indication either that the Legislature intended the amendment to address Sharon's case or, more generally, to cause the MSRS to construe the terms in a QDRO divorced from the meaning those terms are ascribed in the statutes and rules that authorize the QDRO and govern its administration.

[¶ 33] Because the MSRS properly interpreted the plain meaning of the McPhee QDRO, we conclude that the Superior Court's judgment must be vacated and the Board's decision reinstated. This does not mean, however, that Sharon is necessarily without a remedy. A divorce court has continuing jurisdiction to clarify ambiguities and discrepancies in its judgments and orders concerning the distribution of retirement benefits. *See Jed–Harbage*, 2003 ME 74, ¶ 10, 825 A.2d at 352; *Greenwood*, 2000 ME 37, ¶ 9, 746 A.2d at 360. A substantial discrepancy concerning the distribution of retirement benefits between a judgment and the QDRO implementing the judgment constitutes an ambiguity that may justify the exercise of the court's post-judgment clarification authority. That authority includes, where appropriate, the modification of the QDRO to conform to the intent of the court's judgments. *See Eller v. Bolton*, 168 Md.App. 96, 895 A.2d 382, 392, 395 (2006) (recognizing the authority of the trial court to amend a QDRO where the court had expressly retained jurisdiction over the QDRO and the enforcement of the QDRO would frustrate the parties' intent as expressed in the consent judg-

ment); *Ozment v. Ozment*, 11 P.3d 635, 639–40 (Okla.Civ.App.2000).

[¶ 34] In *Estate of McPhee*, we held that the buy-out agreement required John to fulfill his earlier agreement, expressed in the divorce judgment, that Sharon would receive the post-death benefits that, following his death, have been paid by the MSRS to Joanne:

> Inasmuch as its terms are unambiguous, the buy-out agreement may be interpreted as a matter of law. Regardless of any ambiguity between the divorce judgment and the QDRO, the buy-out agreement requires John to fulfill his obligation under paragraph five of the divorce judgment. Joanne, as personal representative of John's estate, is, therefore, obligated to pay Sharon an amount equal to the amount she is presently receiving from the MSRS.

*Estate of McPhee*, 2006 ME 38, ¶ 9, 904 A.2d at 403 (footnote omitted).

[¶ 35] The buy-out agreement was entered into in 2002, well after the Legislature's amendment of section 17852(5) in 1997 adding a new subsection (C) that permits the surviving spouse benefit to be awarded in whole or in part to another person by a QDRO. *See* P.L.1997, ch. 396, § 2 (effective Sept. 19, 1997) (codified at 5 M.R.S. § 17852(5)(C) (2008)). Accordingly, because (1) it is established that the buy-out agreement entitles Sharon to receive the surviving spouse benefit, and (2) at the time the buy-out agreement was completed, Maine law recognized that the surviving spouse benefit could be awarded to Sharon through a QDRO, then (3) Sharon may, upon proper motion, seek from the divorce court an amended QDRO that prospectively directs the MSRS to pay the surviving spouse benefit directly to her in lieu of the payments the MSRS is currently paying to Joanne.[16] In the event Shar-

---

16. The commencement of such direct payments pursuant to an amended QDRO would supersede the existing QDRO and would re-lieve Joanne, as the personal representative of John's estate, of the obligation to make direct

on initiates proceedings before the District Court, Joanne will have the right to defend the same.[17] We offer no opinion regarding the appropriate outcome of any future proceedings.

The entry is:

Judgment of the Superior Court vacated. Case remanded for entry of judgment affirming the decision of the Maine State Retirement System Board of Trustees.

payments to Sharon as required by our prior opinion.

17. Before the Superior Court, Joanne asserted that the MSRS should be enjoined from discontinuing the payments she receives based on constitutional and equitable grounds. These assertions were not ad- dressed by the Superior Court, and we do not have occasion to address them because we have concluded that the MSRS's decision to deny Sharon's petition should be affirmed. Accordingly, there is no res judicata or collateral estoppel bar to Joanne raising these claims in future proceedings.