IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2015 Term

_____

No. 14-0734

_____

FILED

**June 10, 2015**

**released at 3:00 p.m.**
**RORY L. PERRY II, CLERK**
**SUPREME COURT OF APPEALS**
**OF WEST VIRGINIA**

PATRICIA JONES (formerly Akers),
Plaintiff Below, Petitioner

v.

WEST VIRGINIA PUBLIC EMPLOYEES RETIREMENT
SYSTEM, a corporation, d/b/a WEST VIRGINIA PUBLIC
CONSOLIDATED RETIREMENT BOARD,
Defendant Below, Respondent,

and

JUDY VANNOY AKERS,
Defendant Below, Respondent

_____

Appeal from the Circuit Court of Kanawha County
Honorable Tod J. Kaufman, Judge
Civil Action No. 10-C-746

AFFIRMED, IN PART; REVERSED, IN
PART; AND REMANDED

_____

AND

_____

No. 14-0764

_____

JUDY VANNOY AKERS,
Defendant Below, Petitioner

v.

PATRICIA JONES (formerly Akers),
Plaintiff Below, Respondent

and

WEST VIRGINIA PUBLIC EMPLOYEES RETIREMENT
SYSTEM, a corporation, d/b/a WEST VIRGINIA PUBLIC
CONSOLIDATED RETIREMENT BOARD,
Defendant Below, Respondent

Appeal from the Circuit Court of Kanawha County
Honorable Tod J. Kaufman, Judge
Civil Action No. 10-C-746

REVERSED AND REMANDED

Submitted: May 12, 2015
Filed: June 10, 2015

Anthony R. Veneri, Esq.
Veneri Law Offices
Princeton, West Virginia
Counsel for Patricia Jones

Lenna R. Chambers, Esq.
Bowles Rice LLP
Charleston, West Virginia
Counsel for West Virginia Public
Consolidated Retirement Board

Randal W. Roahrig, Esq.
The Roahrig Law Firm
Princeton, West Virginia
Counsel for Judy Vannoy Akers

JUSTICE LOUGHRY delivered the Opinion of the Court.

SYLLABUS BY THE COURT

1. "Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review." Syl. Pt. 1, *Chrystal R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995).

2. Pursuant to the provisions of West Virginia Code § 5-10-27(b)(1) (2013), a surviving spouse of a participant in the West Virginia Public Employees Retirement System with ten or more years of credited service, who is entitled to a deferred annuity under West Virginia Code § 5-10-21 (2013), shall, barring a previously-executed spousal waiver, immediately receive a preretirement death annuity.

3. The distribution of retirement benefits from the West Virginia Public Employees Retirement System to a former spouse is accomplished through a qualified domestic relations order and not through the terms of the final order of divorce.

4. A family court has the necessary authority to posthumously enforce, revise, modify, or amend a domestic relations order for the purpose of establishing such order as a qualified domestic relations order.

LOUGHRY, Justice:

Through this consolidated appeal, petitioners, Patricia Jones ("Patricia" or "Mrs. Jones") and Judy Vannoy Akers ("Mrs. Akers"), challenge the decisions of the respondent, the West Virginia Public Employees Retirement System ("PERS") d/b/a the West Virginia Consolidated Public Retirement Board (the "Board"), in connection with retirement benefits PERS owed to its former member, the decedent Danny Akers.[1] By its ruling of July 10, 2014, the Circuit Court of Kanawha County granted the Board's motions for summary judgment against Mrs. Jones and Mrs. Akers. Mrs. Akers seeks to reverse the Board's issuance of disability retirement benefits to her as Mr. Akers' surviving spouse, arguing that she is entitled to preretirement death benefits instead.[2] Mrs. Jones challenges the Board's ruling that she was not entitled to receive any retirement benefits despite the provision for those benefits in her divorce decree, due to the absence of a qualified domestic relations order ("QDRO").[3] Upon our exhaustive review of the submitted briefs, record, statutes, regulations, and pertinent case law, we reverse the circuit court's ruling on the issue of Mrs. Akers' entitlement to preretirement death benefits, finding the Board's posthumous

---

[1]Patricia was the first wife of Mr. Akers; she is remarried.

[2]Disability retirement benefits are governed by West Virginia Code § 5-10-25 (2013); preretirement death benefits are authorized by West Virginia Code § 5-10-27 (2013).

[3]See 29 U.S.C. § 1056(d)(3)(B)(i)(I) (2012) (defining QDRO as domestic relations order that recognizes existence of alternate payee's right to all or portion of benefits payable under pension plan).

1

grant of disability retirement benefits was in error. With regard to the circuit court's ruling on the issue of Mrs. Jones' entitlement to retirement benefits, we affirm the trial court's decision that the Board was correct in rejecting the domestic relations orders submitted by her counsel.[4] In the interest of enforcing the equitable distribution rights previously awarded to Mrs. Jones in her final divorce decree, however, we invoke the equitable powers of this Court, as well as the continuing jurisdiction of the Family Court, to permit the posthumous entry of a QDRO that provides for distribution of Mrs. Jones' equitable interest in that portion of Mr. Akers' retirement assets recognized as marital property.[5] Accordingly, we reverse the circuit court's ruling that Mrs. Jones has no entitlement to seek Mr. Akers' PERS benefits based on her failure to obtain an enforceable QDRO and remand this case for purposes of allowing her counsel to prepare a third, and hopefully final, domestic relations order that meets with the Board's approval and fulfills the statutory and regulatory requirements that govern this matter.

## I. Factual and Procedural Background

After more than thirty years of marriage, Patricia and Danny Akers were divorced on June 30, 2008. In connection with the divorce proceedings, the Family Court entered a QDRO–an order designed to permit Patricia to obtain her proportionate interest

[4]One order was submitted in June 2009 and another in December 2010.

[5]While Mr. Akers was a PERS member for thirty years, only twenty-six years and six months of that membership occurred during the course of his marriage to Mrs. Jones.

2

in the PERS retirement benefits as agreed upon through the divorce decree.[6]  Upon the Board's review of the June 4, 2009, QDRO[7] ("June QDRO"), the Board rejected the proposed document because it contained inconsistent directions, usurped the election of benefits statutorily reserved to the PERS member, and required an award of retirement benefits in excess of statutory and regulatory authorization.  By letter of July 6, 2009, the Board notified counsel for Mr. Akers and Mrs. Jones regarding the non-qualification of the June QDRO.  Whereas counsel for Mr. Akers received the Board's communication, counsel for Mrs. Jones, as well as Mrs. Jones herself, maintain they did not receive the subject correspondence.

On September 5, 2009, Judy Vannoy and Danny Akers were married.  Ten days later, Mr. Akers submitted a disability retirement application to the Board.  Mr. Akers died, due to renal failure, on December 16, 2009.[8]  In January 2010, the Board sent Mrs. Akers an application for a preretirement death benefits annuity.  After she submitted the completed paperwork, the Board discovered the pending disability retirement application.

---

[6]Under the divorce decree, Patricia was entitled, *inter alia*, to "one half (50%) of the Respondent's [Mr. Akers'] retirement assets accumulated as of the date of separation."  The date of separation was July 8, 2006.

[7]Fully recognizing that employment of the acronym QDRO is technically incorrect given that the domestic relations order was never "qualified" by the Board, we choose to use the acronym for ease of reference.

[8]Mr. Akers had been on sick leave since April of 2009.

Mrs. Akers was informed by the Board that she would receive a preretirement survivor benefit only in the event the Board denied the disability retirement application. On March 3, 2010, the Board posthumously approved the disability retirement application, and Mrs. Akers was awarded benefits retroactive to January 1, 2010.

On January 19, 2010, counsel for Mrs. Jones corresponded with the Board to inquire, in light of Mr. Akers' death, when his client would begin receiving retirement benefits pursuant to the QDRO. The Board responded to this letter, indicating that the June QDRO had been rejected in July 2009 and further informing Mrs. Jones' counsel that his client was not entitled to any payments due to the lack of an enforceable QDRO in effect at the time when the survivor benefits were issued to Mrs. Akers.

On February 11, 2010, Mrs. Jones instituted a complaint against Mrs. Akers, individually and in her capacity as Administratix of the Estate of Mr. Akers, in the Circuit Court of Mercer County.[9] By agreement of the parties, the lawsuit was subsequently dismissed.

On April 27, 2010, Mrs. Jones filed a new civil action in the Circuit Court of Kanawha County against Mrs. Akers and included the Board as a party. Through this

---

[9]The Board was not named as a party to this proceeding.

4

action, she sought a writ of mandamus as well as injunctive relief. Upon the Board's motion, the circuit court dismissed the complaint for failure to state a claim.[10] Mrs. Jones appealed the dismissal to this Court. During the pendency of the appeal, Mrs. Jones submitted a second QDRO to the Board on December 9, 2010 ("December QDRO"). The Board denied the December QDRO on grounds that it lacked any authority to enter such an order posthumously. When this Court reversed the dismissal[11] and remanded the matter for further proceedings on the merits of the action, Mrs. Akers filed a cross-claim against the Board through which she averred that the Board should have awarded her a preretirement death benefit rather than a disability retirement benefit.

Following discovery, the Board filed motions for summary judgment against Mrs. Jones and Mrs. Akers. By order entered on July 10, 2014, the circuit court granted the Board's motions for summary judgment. Mrs. Jones appeals from the circuit court's rulings regarding the non-enforceability of the QDROs and her consequent lack of entitlement to Mr. Akers' retirement benefits. Mrs. Akers appeals from the circuit court's ruling that the

---

[10]*See* W.Va.R.Civ.P.12(b)(6).

[11]Our reversal was based on the trial court's finding that the plaintiff had failed to allege the necessary elements to maintain a mandamus action and upon the court's reliance on the absence of a valid QDRO as the basis for finding the complaint legally insufficient. *See Patricia Jones v. W.Va. PERS*, No. 101327, 2011 WL 8183115 (W.Va. Sept. 23, 2011) (memorandum dec'n).

5

Board properly issued a disability retirement annuity rather than a preretirement death annuity. It is from these rulings that Mrs. Jones and Mrs. Akers each seek respective relief.

## II. Standard of Review

Axiomatically, our review of summary judgment rulings is *de novo*. *See* Syl. Pt. 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994). Also applicable to this case is syllabus point one of *Chrystal R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995): "Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review." With these standards before us, we proceed to determine whether the circuit court committed error in its rulings in this matter.

## III. Discussion

### A. Mrs. Akers' Disability Retirement Award

Because the nature of the retirement award at issue necessarily affects the outcome of this case, we first address Mrs. Akers' appeal through which she challenges the Board's award of benefits to her pursuant to the disability retirement statute as opposed to the preretirement death statute. *Cf.* W.Va. Code § 5-10-25 (2013) to W.Va. Code § 5-10-27 (2013). In addressing this issue below, the circuit court determined the Board was required to process the disability retirement application pending at the time of Mr. Akers' death due

6

to the "mandatory language of W.Va. Code § 5-10-25 and W.Va. Code R. § 162-5-19.2."  The circuit court, in choosing to adopt the Board's position on this issue, was decidedly misguided.

The Board contends that upon the filing of a disability application, the Board is obligated to consider and award a disability retirement if the PERS member qualifies as disabled.  As support for its position, the Board emphasizes the introductory language of West Virginia Code § 5-10-25, which provides:  "*Upon the application* of a member of the retirement system . . . any member . . . , who has ten or more years of credited service . . . and who becomes totally and permanently incapacitated for employment . . . , may be retired by the board . . . ."  *Id.* at 25(a) (emphasis supplied).  In stating its position, the Board completely disregards the legislative grant of discretion that occurs in that same statutory clause by virtue of the terms "*may* be retired."  *Id.* (emphasis supplied).

Seeking to downplay its authority to make disability retirement determinations, the Board posits that it lacked discretion to consider an alternate type of retirement award due to the pending disability application.  Essentially, the Board suggests it could not allow the disability retirement application to lie in perpetual administrative purgatory as it was mandated to make a disability retirement award notwithstanding the intervening death of Mr. Akers.   We find this argument to be wholly lacking in merit.

7

When discussing the Board's action in response to a member's application for disability retirement benefits, the Legislature employs the term "may" three separate times. *See* W.Va. Code § 5-10-25(a). Clearly, there are disability applications that fall outside the realm of undisputed medical certainty in terms of whether a PERS member is incapacitated from employment due to a purported disability. The legislative rules anticipate and address the Board's authority to deny disability applications. *See* 162 C.S.R. §§ 2-3.3, 2-4.1 (imposing discretion in Board to deny application where "the member fails to cooperate fully in the examination process" and separately requiring Board to advise applicant in writing of reasons for denial of disability application). In full recognition of the Board's need for discretion to resolve questionable cases, as well as its duty to review and approve those cases where disability is conclusive, the Legislature granted the Board both the authority and the responsibility for making such determinations. Given the indisputable grant of discretion to make disability determinations, we reject the Board's position that it lacks discretion to act upon its receipt of a disability retirement application. The Board's role is more than that of a mindless conduit, necessarily compelled to approve each and every disability application presented to it.

Seeking to dispel this grant of decisional discretion, the Board convinced the circuit court that the inclusion of the word "shall" in a legislative regulation enacted *after* the disability award was issued in this case has effect and is controlling. Neither contention

8

is correct. As part of its ruling, the circuit court expressly relied upon a legislative rule–162 C.S.R. § 5-19.2. Because that rule took effect on April 12, 2010, subsequent to the Board's grant of disability retirement to Mrs. Akers on March 3, 2010, it is clearly inapplicable to the Board's disability determination. Even if the rule had been in effect at the time of the disability award, the word "shall" is used to refer to the prompt administrative handling of a disability application. The rule requires that "[u]pon receipt of properly executed forms submitted by the disability retirant . . . , the Board shall process the disability retirement annuity as soon as administratively feasible." *Id.* Critically, nothing in the directive to expediently administer applications serves to negate the discretion statutorily reposed in the Board to consider a disability application in the first instance.[12]

Having rejected the circuit court's conclusion that the Board was mandated to make an award of disability retirement, we proceed to consider whether the Board should have awarded a preretirement death annuity in lieu of the disability annuity issued in this case. In stark contrast to the disability retirement statute, the preretirement death statute is

---

[12]We further observe that the inclusion of "shall" within 162 C.S.R. § 5-19.2 does not serve to abrogate the statutory directives contained in West Virginia Code § 5-10-27(b)(1). If the Board had hoped to circumscribe the perceived "tension" between sections twenty-five and twenty-seven, the new rule does not accomplish this objective. *Cf.* W.Va. Code §§ 5-10-25, -27(b)(1). Whereas an immediate and automatic entitlement to a survivor's annuity in the event of death exists under West Virginia Code § 5-10-27(b)(1), there is no correspondent statutory entitlement to a disability retirement upon the event of death during the disability application process or upon an application without an intervening death.

9

decidedly framed in mandatory terms. Pursuant to West Virginia Code § 5-10-27(b)(1), the Legislature has directed that when a member having ten or more years of credited service "[d]ies; and leaves a surviving spouse, *the surviving spouse shall immediately receive* an annuity computed in the same manner in all respects as if the member had: (A) Retired the day preceding the date of his or her death . . . ." *Id.* (emphasis supplied).[13] This statute, unlike West Virginia Code § 5-10-25, clearly requires the Board to adhere to legislatively-specified imperatives. *See* W.Va. Code § 5-10-27(b)(1).

Of particular import to Mrs. Akers is the fact that she would have received a larger award if the Board had issued her annuity as a preretirement death annuity. Because Mr. Akers had been a member of PERS for thirty years at the time of his death, the preretirement death annuity would have applied those thirty years to the statutory multiplier of two percent[14] in calculating the amount of the annuity award. Under the disability retirement statute, the maximum basis for an annuity award is fifty percent of the retirant's

---

[13]The statute contemplates that a spouse may execute a waiver of the preretirement death benefits in advance of the participant's death. Provided the waiver has been properly executed and accepted by the Board, the PERS participant is permitted to identify in his or her spouse's stead, "a beneficiary who has an insurable interest in the member's or former member's life." W.Va. Code § 5-10-27(b)(1).

[14]*See* W.Va. Code § 5-10-22(a) (2013) (providing that PERS members retiring after 1970 shall receive straight life annuity equal to two percent of their final average salary multiplied by years of credited service).

10

final average salary and the award terminates at age sixty-five.[15] *See* W.Va. Code § 5-10-25(c). If the Board had proceeded under the preretirement death annuity statute, Mrs. Akers would have received an annuity award based on sixty percent of Mr. Akers' final average salary rather than fifty percent.

In an attempt to convince us that proceeding under the disability retirement statute was proper, the Board contends that beneficiaries of PERS members who die while a disability application is pending typically will receive a larger award under the disability retirement statute than if the award is made under the preretirement death annuity statute. Unlike Mr. Akers who had a lengthy period of employment before experiencing disability, the Board submits that most PERS employees have significantly fewer years of service when applying for disability benefits. We find this contention rooted in policy-based concerns that are expressly reserved to the Legislature.[16] At present, the legislative position on this issue is crystal clear: Mrs. Akers, as the surviving spouse, was entitled to receive a preretirement death annuity. Pursuant to the provisions of West Virginia Code § 5-10-27(b)(1), a

---

[15]Had Mr. Akers been alive and receiving disability retirement benefits, those benefits would have ceased under the statute upon his attainment of age sixty-five. According to testimony provided by Anne Lambright, the former executive director of the Board, the disability retirement award would have converted to a regular retirement at age sixty-five.

[16]Anne Lambright testified that the tax consequences of a disability survivor annuity are more favorable than those which attach to a preretirement death annuity. We find this justification for the Board's selection between the two statutes (W.Va. Code §§ 5-10-25, 27(b)(1)) to be policy based and, similarly, a decision that is better left to the Legislature.

surviving spouse of a participant in PERS with ten or more years of credited service, who is entitled to a deferred annuity under West Virginia Code § 5-10-21 (2013), shall, barring a previously-executed spousal waiver, immediately receive a preretirement death annuity.

Having concluded that the Board lacked the necessary discretion to circumvent the statutory directives of West Virginia Code § 5-10-27(b)(1), we reverse the trial court's ruling that a disability retirement annuity was properly issued to Mrs. Akers.[17] Upon referral to the Board for issuance of a preretirement death annuity, the relief to be awarded in terms of structuring and awarding the corrected annuity payments to Mrs. Akers is prospective only. Furthermore, Mrs. Akers is under no obligation to return any of the annuity funds she has received to date from the Board.[18]

---

[17]Given our decision that the award should have been made under the preretirement death annuity statute, we find it unnecessary to address whether the grant of the disability retirement award was improper based on its posthumous issuance. When the Board made the award to Mrs. Akers, there was no basis for a posthumous award; posthumous awards are now authorized by legislative rule pursuant to amendments that took effect on July 6, 2012. *See* 162 C.S.R. § 2-4 (providing that Board "shall process the disability application and pay benefits as though the applicant were still alive and elected a 100% Joint & Survivor disability annuity naming his or her surviving spouse" if applicant dies during processing of disability application). However, even if the amended rule were in effect, we remain convinced that the preretirement death annuity statute necessarily trumps the disability retirement statute due to the mandatory language of West Virginia Code § 5-10-27(b)(1).

[18]The Board has a pending cross-claim against Mrs. Akers for the return of the disability retirement funds upon a determination that it wrongly paid her such funds.

12

## B. Mrs. Jones' Entitlement to Retirement Annuity

### 1. June QDRO

As the basis for her appeal, Mrs. Jones asserts that the trial court erred in its respective determinations that each of the QDROs she submitted to the Board were invalid. We separately examine the QDROs in question. In rejecting the June QDRO, the Board articulated several reasons for its refusal to qualify the document. The first issue identified was the conflicting instructions regarding Mr. Akers' election of retirement benefits. The June QDRO provides in one section of the document that, as required by West Virginia Code § 5-10-22 (2013),[19] Mr. Akers will have the right to select from the available types of annuities set forth in West Virginia Code § 5-10-24. At the same time, however, Mrs. Jones inserted language in paragraph 7(f) that required Mr. Akers to designate her "as the surviving spouse or survivor beneficiary of his retirement benefits" and to "elect a joint survivor annuity" with Mrs. Jones named as the beneficiary. The Board asserts that the quoted language conflicts with the standardized language in paragraph 7(d), which requires that "the form of benefit at time of payment shall be elected by the Participant."[20] The

---

[19]"[U]pon his or her retirement he or she has the right to elect an option provided in section twenty-four [§ 5-10-24] of this article." W.Va. Code § 5-10-22(a).

[20]A retiring PERS member may select from three different types of annuities: (1) a lifetime annuity, payable during the member's life with no survivor benefits; (2) Option A–Joint and survivor annuity, a reduced annuity payable to the member that, upon the member's death, continues to be paid during the lifetime of the designated beneficiary; and (3) Option B–Modified joint and survivor annuity, one-half of a reduced annuity payable to the member during his or her lifetime with the remaining one-half awarded to a designated

(continued...)

second basis for the Board's rejection of the June QDRO was the naming of Mrs. Jones as the alternate payee for purposes of calculating survivor benefits.[21]

Refusing to acknowledge the inherent inconsistency of these directives, Mrs. Jones asserts that the June QDRO was fully enforceable. Looking entirely beyond state public retirement systems, Mrs. Jones focuses on the options that are available under either private plans or plans subject to the Employee Retirement Income Security Act of 1974 ("ERISA"). *See* 29 U.S.C. §§ 1001 to -1461 (2012). Essentially positing that the purpose of a QDRO is to fully effectuate the terms of a final order of divorce, Mrs. Jones maintains that the necessary statutory authority and case law permit what she sought to accomplish. Upon distillation of these arguments, we find that Mrs. Jones is describing the law as she wishes it to be, rather than as it currently exists.

Mrs. Jones admits that the June QDRO "deviates" from the Board's model QDRO, but nonetheless insists that the subject variances do not prevent its enforcement. The two acknowledged variances include the provisions in paragraph 7(f), which required Mr. Akers to elect the joint and survivor annuity with Mrs. Jones being named as the

---

[20](...continued)
beneficiary upon the member's death. *See* W.Va. Code § 5-10-24,

[21]The model QDRO, prepared and distributed by the Board, expressly provides that the alternate payee is not to be identified as the alternate payee for these purposes.

beneficiary, and the provision in paragraph 7(b) that required Mrs. Jones to be named as the surviving spouse for purposes of calculating benefits allocated in the QDRO. Characterizing the first variance as an issue of timing, Mrs. Jones argues that the QDRO merely seeks to enforce the advance election of retirement benefits that Mr. Akers made as part of the divorce agreement. Addressing the second variance–the naming of an ex-spouse as a surviving spouse within the terms of a QDRO– Mrs. Jones suggests that the Legislature has implicitly authorized the use of a QDRO for this purpose. Each of these arguments fails upon analysis.

After citing federal case law interpreting ERISA for the proposition that literal compliance is not required for enforcement of a QDRO,[22] Mrs. Jones maintains that the language in paragraph 7(f) that required Mr. Akers to select a joint and survivor annuity with Mrs. Jones named as his sole surviving beneficiary did not render the June QDRO unenforceable. Not only is the federal law relied upon by Mrs. Jones inapplicable, but her

_____

[22]The cases Mrs. Jones relies upon for this proposition are wholly distinguishable from the issues in this case. *See, e.g., Metropolitan Life Ins. Co. v. Bigelow*, 283 F.3d 436, 443-44 (2nd Cir. 2002) (finding omission of decedent's and daughters' addresses non-fatal as plan administrator knew both decedent's address and address of daughters' counsel); *Trustees of Directors Guild of America v. Tise*, 234 F.3d 415, 426 (9th Cir. 2000) (ruling omission of ex-wife's current mailing address non-fatal to enforcement of QDRO given inclusion of counsel's mailing address). Rather than an inadvertent address omission or the typographical insertion of a name readily acknowledged not to be a dependent of the parties, the compliance-related issues in this case are substantive in nature and not, as in the cited cases, technical matters of form completion.

15

insistence that the Board may use the divorce decree to correct the non-conforming aspects of the June QDRO indicates a grave misunderstanding of the laws which govern access to public retirement funds.

By design, state retirement systems are exempt from the provisions of ERISA. *See Erb v. Erb*, 661 N.E.2d 175, 178 (Ohio 1996) (recognizing that Congress expressly exempted government retirement systems from ERISA); 29 U.S.C. § 1003(b)(1) (providing that ERISA does not apply to employee benefit plan defined as "governmental plan").[23] While operating outside the statutory provisions that govern ERISA, PERS is subject to applicable IRS provisions. *See* W.Va. Code § 5-10-3a(c) (2013) (pronouncing that PERS "is intended to meet the federal qualification requirements of Section 401(a) [26 U.S.C. § 401(a)] and related sections of the Internal Revenue Code as applicable to governmental plans"). For PERS to maintain its status as a public retirement fund, which in turn allows its members to make tax-deferred contributions, adherence to federal tax laws is required. The controlling IRS provisions generally define a QDRO and establish the parameters necessary for the use of such orders. *See* 26 U.S.C. § 414(p) (2012).

---

[23]*See* 29 U.S.C. § 1002(32) (defining "governmental plan").

To assure compliance with federal tax laws,[24] the Board promulgated rules that address the requisites of domestic relations orders entered by this state's courts. To be enforceable in this state, a QDRO must provide the name and last known address of the participant and his or her spouse and designate the ex-spouse as the "alternate payee." 162 C.S.R. § 1-6.2.5.1; 26 U.S.C. § 414(p). Inclusion of the "percentage of the marital property portion of the member's or retirant's Vested Accrued Retirement Benefit which is to be paid to the alternate payee" is another critical component of the QDRO. 162 C.S.R. § 1-6.2.5.3. Consonant with federal tax laws, a QDRO "may not require the member's retirement plan to provide the alternate payee with any type or form of benefit, or any option, not otherwise provided under the plan . . . ." *Id.* at § 1-6.2.6. Of particular import to the issue at hand is the rule which requires that an ex-spouse receives his or her proportionate share of the retirement award "at the same time and *in the same form as the benefit elected by and paid to the member once he or she enters pay status*." *Id.* at § 1-6.2.3 (emphasis supplied).

The statutory right to decide at the point of retirement between the three annuity options is a pivotal construct of PERS. Pursuant to West Virginia Code § 5-10-24, a retiring PERS member has a choice of three different types of annuities.[25] This right of election is reserved both by statute and by rule to the PERS member. *See id.*, 162 C.S.R. §

---

[24]*See* W.Va. Code § 5-10-3a(c).

[25]*See supra* note 20 (describing annuity options provided by W.Va. Code § 5-10-24).

1-6.2.3. The election of benefits cannot be made by the former spouse as the alternate payee. *See King v. King*, No. 35696, 2011 LEXIS 242 (W.Va. May 16, 2011) (memorandum dec'n) (recognizing that QDRO does not permit ex-wife to dictate type of retirement benefits ex-husband elects); *Beddell v. Beddell*, 2009 WL 4263631, (Ohio App. 2009) (finding both that alternate payee ex-wife had no authority to decide type of benefit PERS member elects and that trial court could not direct ex-husband's choice of benefits). Once the election has been made by the PERS member, the specified percentage of the retirement benefits is payable to the alternate payee pursuant to the terms of a QDRO. But the QDRO cannot control the election itself as that matter is expressly reserved to the PERS member.

As a creature of statute, PERS has only those rights granted to it by the Legislature. *See Hansford v. PERS*, 868 N.E.2d 708, 711 (Ohio App. 2007) (recognizing that state retirement systems, as statutorily-created entities, are expressly limited to grants of legislative power). By law, PERS benefits are not subject to execution, attachment, garnishment, bankruptcy or insolvency laws, or assignment. *See* W.Va. Code § 5-10-46 (2013). This protection against alienation of benefits reflects a policy decision laudably aimed at preserving the retirement assets of public employees. *See State ex rel. DHHR v. PERS*, 183 W.Va. 39, 42, 393 S.E.2d 677, 680 (1990) (observing that W.Va. Code § 5-10-46 is the result of public policy that "is especially wary of allowing garnishment of pension income" and recognizing that garnishment is permitted only upon statutory authorization).

18

With an amendment to the statute in 2000, PERS benefits were made subject to QDROs. *See* 2000 W.Va. Acts, ch. 204, p.1703 (amending W.Va.§ 5-10-46 to allow QDROs to affect distribution of PERS benefits). However, the Board can only release funds from PERS pursuant to a QDRO that complies with state retirement laws. *See* 162 C.S.R. § 1-6.2. Thus, even if a PERS member agrees to make a particular election of benefits as part of his or her divorce agreement, that agreement by itself cannot effect the removal of a retirant's funds from PERS. *See Ohio PERS v. Coursen*, 806 N.E.2d 197, 201 (Ohio App. 2004) (ruling that former wife was not entitled to survivor benefits despite ex-husband's agreement to designate her as "irrevocable beneficiary" based on ex-husband's failure to complete "member beneficiary designation" form); *Hansford*, 868 N.E.2d at 712 (holding that PERS was prevented from issuing statutory survivor benefits to ex-wife notwithstanding provision of settlement agreement allowing such benefit because of ex-husband's failure to authorize Board to act by designating ex-wife as beneficiary).

Critically, the distribution of retirement benefits from PERS to a former spouse is accomplished through a QDRO and not through the terms of the final order of divorce. *See King*, 2011 LEXIS 242. At issue in *King* was the family court's attempt to circumvent the provisions of the QDRO to increase the amount of retirement benefits that the ex-wife was receiving. As we recognized in *King*, the terms of the QDRO were controlling in regards to how the PERS benefits were to be paid. Not only did the family court in *King*

have no authority to compel an election expressly reserved in the QDRO to the PERS member, but it could not construe the QDRO in a manner inconsistent with the retirement statutes. *See id; see also Bd. of Trustees of Indiana Pub. Employees' Ret. Fund v. Grannan*, 578 N.E.2d 371, 376 (Ind. App. 1991) (recognizing that PERF was not obligated to comply with trial court's rulings in conflict with statutes and invalidating provisions of QDRO that required early retirement by husband or preretirement payments by PERF to wife).

Seemingly overlooked by Mrs. Jones is the fact that the Board's initial examination of a QDRO and its subsequent application of an approved QDRO is performed without reference to a final order of divorce. When the Board reviews a submitted QDRO for purposes of determining whether that order complies with statutory and regulatory law, it does not have a copy of the final order of divorce before it. Its only task is to determine whether the QDRO is enforceable in terms of whether the required information is set forth and whether the proposed order exceeds the permissible directives applicable to the PERS member or the Board. The limited role of a retirement board in its review of a QDRO was explained in *McPhee v. Maine State Retirement System*, 980 A.2d 1257 (Maine 2009):

> Once a proposed QDRO is received, the statute does not charge the executive director with determining whether it squares with the intent of the parties or the divorce court as expressed in a separate settlement agreement or divorce judgment, and explicitly prohibits the MSRS from being made a party to the divorce action. Rather, the executive director's duty is a narrow one: to determine whether the QDRO meets specific statutory criteria . . . . These criteria include the

20

> requirements that the QDRO be sufficiently specific concerning the exact division of benefits, and that the QDRO "not require the retirement system to provide a type or form of benefit or an option not otherwise provided by the retirement system." The statute makes no provision, however, for the MSRS to assess a proposed QDRO in relation to the related settlement agreement, divorce judgment, or other documents.

*Id.* at 1264 (internal citations omitted).

The Board's determination that the June QDRO was unenforceable due to the inclusion of language in paragraph 7(f) that required Mr. Akers to make a particular election of benefits was required by law. *See* W.Va. Code § 5-10-24, 162 C.S.R. § 1-6.2.3. In unmistakably clear terms, the QDRO states: "[N]othing in this Order shall be construed as granting the Alternate Payee any election rights with respect to the form of benefit; rather, the form of benefit at time of payment shall be elected by the Participant." In forcing Mr. Akers to choose a specific type of annuity benefit, the June QDRO exceeded the scope of permissible actions contemplated and authorized by legislative rule. *See id.* By law, the Board was mandated to "not honor any Qualified Domestic Relations Order seeking to divide a members [sic] pension benefit which does not meet the requirements of this rule."[26] 162 C.S.R. § 1-6.2.

---

[26]Given the clear violation of the election of benefits reserved to a PERS member, we find it unnecessary to address the Board's additional bases for its disallowance of the June QDRO.

In her attempt to cast the benefits issue as one of timing only, Mrs. Jones fails to appreciate the constraints imposed on the Board's actions and the permissible use of a QDRO within the public retirement system.[27] Through her argument that Mr. Akers was simply being required to act consistent with the advance election he made as part of the divorce agreement, Mrs. Jones ignores the statutory design of PERS. The Board has no authority "to look beyond the four corners of a QDRO to determine the underlying intent of the parties." *McPhee*, 980 A.2d at 1268. And, as discussed above, the election of benefits is expressly reserved to the PERS member and is required to be made at the time the member is preparing to retire. The Board has no obligation to try to enforce any preexisting agreement made by a PERS member in relation to those benefits.[28] Only upon the completion of the paperwork provided by PERS is an election of benefits accomplished. And that election, barring three statutory events, is irrevocable. *See* W.Va. Code § 5-10-24.

Despite its limited ability to enforce the provisions of a divorce agreement, the Board correctly observes that the right of a party to compel performance of those agreements

[27]The fact that QDROs can be used under ERISA to name a former spouse as a sole surviving beneficiary to the exclusion of a subsequent spouse has no bearing as ERISA provisions are inapplicable. *See* Keith S. Bozarth, *QDROs and Public Pensions in Missouri*, 51 J. Mo. B. 149 (1995) (observing that "the full range of standards normally applicable to QDROs does not apply" due to exemptions from ERISA for governmental plans).

[28]*See Tise*, 234 F.3d at 424 (recognizing that "a QDRO creates obligations for the pension plan, not for any individual participant or beneficiary.").

22

remains.[29] Critically, however, the Board can only act consistent with its statutory authority. Pursuant to this authority, an ex-spouse may receive up to 100 percent of the marital property portion of the retirement benefits through a QDRO. In this case, because Mrs. Jones was only married to Mr. Akers during twenty-six of the thirty-years he was a PERS member, the Board could allow Mrs. Jones to have the proportional amount agreed upon by the parties– fifty percent–of the retirement benefits earned during the course of the marriage. The Board submits that any amount above this would be in excess of its statutory authority. *See McPhee*, 980 A.2d at 1267 (observing that "even if John and Sharon had specifically stated in their QDRO that they wished to transfer the 'surviving spouse' service retirement benefit to Sharon, there would have been no statutory authority for doing so and the order would not have been qualified").

Seeking to create law through sophistry, Mrs. Jones posits that the Legislature has implicitly sanctioned what she sought to accomplish here–the naming of herself as sole surviving spouse through the QDRO. Her argument springs from the right of a *retired* PERS member who experiences divorce or spousal death to change his or her annuity selection.[30] *See* W.Va. Code § 5-10-24. Because the Board's approval of the new annuity

---

[29]As the Board noted, there are alternate means of seeking to enforce those rights.

[30]A retired PERS member may revoke a joint and survivor annuity option and replace it prospectively with a straight life annuity if the spouse dies or the member becomes divorced. Similarly, a retired PERS member who subsequently remarries is permitted to
(continued...)

23

selection is subject to whether the election would conflict with the terms of a preexisting QDRO, Mrs. Jones theorizes that the Board has anticipated and authorized PERS members to make their ex-spouses the sole surviving beneficiary of their retirement benefits through a QDRO. We do not reach the same conclusion. Instead, we find the statutory language that references a preexisting QDRO to reflect the legislative objective of enforcing established benefit rights. Consequently, the retired PERS member cannot seek, upon the instance of divorce or spousal death, to cancel the existing rights of an ex-spouse to his or her proportionate share of marital property through an existing QDRO.[31] West Virginia Code § 5-10-24 does not evince a legislative decision to prevent a PERS member from making any changes that may involve a new spouse when a QDRO is in place; instead, it merely protects the established rights of a former spouse from extirpation.

Based on the foregoing, we affirm the circuit court's decision that the June QDRO was not enforceable. As the law exists, there is no statutory authority to accomplish through a QDRO directed at PERS benefits what Mrs. Jones bargained for as part of her divorce: survivorship benefits. Addressing the absence of survivorship benefits to former

---

[30](...continued)
prospectively elect a joint survivor annuity option. *See* W.Va. Code § 5-10-24.

[31]While Mrs. Jones asserts that this Court held in *King* that a party could use a QDRO for the purpose of preventing the other party from naming a subsequent spouse as a beneficiary, that issue was not before the Court and, thus, was never specifically ruled upon. *See King*, 2011 LEXIS 242.

24

spouses under Ohio law,[32] the court commented in *Patterson v. Patterson*, 784 N.E.2d 1213

(Ohio. App. 2003), that "the issue of whether state retirement plans should have stronger

protections for nonmember former spouses is one that must be left for resolution by our

General Assembly." *Id.* at 1218.


## 2.  December QDRO

In rejecting the December QDRO, the Board identified two reasons for its

decision by letter dated April 1, 2011.  The first delineated issue was the posthumous nature

of the submission.  According to the Board, "[s]tate law does not require CPRB [Board] to

accept QDROs issued after the death of the participant."[33]  The second ground for the

rejection was the provision, contrary to the model QDRO,[34] that required Mrs. Jones to be

treated as the Alternate Payee for purposes of calculating survivor benefits.  In explanation,

the Board stated that this "could result in a violation of the legal requirement under

---

[32]Through specific legislation, Ohio has directed that an alternate payee does not have a survivorship right in a participant's benefits.  *See* Ohio Rev. Code Ann. § 3105.86 (Anderson 2008) (providing for termination of alternate payee's right to benefits commensurate with death of participant or alternate payee, whichever occurs first).

[33]In further explanation, the Board stated that acceptance of a posthumous QDRO "could result either in a violation of the legal requirement that a QDRO may not require the plan to provide for increased benefits determined on the basis of actuarial value, or in an impermissible diversion of fixed benefits already payable to the death beneficiary specified by the Participant under the Plan."

[34]*See supra* note 21.

applicable state regulations that a QDRO may only divide the marital property portion of the Participant's Vested Accrued Retirement Benefits."

Citing federal law and model QDRO language that provides for amendments, Mrs. Jones asserts that posthumous QDROs are enforceable. She refers specifically to the following model QDRO language:

> 13. In the event that the Plan Administrator does not approve the form of this Order, or should it be subsequently determined that amendment of this Order is necessary to ensure its status as a QDRO, then each party shall cooperate and do all things reasonably necessary to devise a form of Order acceptable to the Plan Administrator consistent with applicable law.
>
> 14. This Court retains jurisdiction to enforce, revise, modify, or amend this Order insofar as is necessary to establish or maintain its qualification as a QDRO, provided, however, that neither this Order nor any subsequent revision, modification, or amendment shall require the Plan to provide any form or amount of benefit not otherwise provided under the Plan.

As an additional basis for her argument, Mrs. Jones looks to both the existence of West Virginia Code § 5-10-44 (2013),[35] which provides for the corrections of errors, as well as the Board's reliance on that provision to alter the benefit payment it was remitting to Mrs.

---

[35]Pursuant to West Virginia Code § 5-10-44(a), "[i]f any change or employer error in the records of any participating public employer or the retirement system results in any member, retirant or beneficiary receiving from the system more or less than he or she would have been entitled to receive had the records been correct, the board shall correct the error."

Akers.[36] Mrs. Jones further submits that the circuit court overlooked the fact that enforcement of the December QDRO would be prospective in effect.

We agree with the circuit court that the federal law relied upon by Mrs. Jones for posthumous enforcement of QDROs is inapplicable due to distinct statutory provisions found in ERISA that are non-existent in PERS. *See Nat'l City Corp v. Ferrell*, No. 1:03CV 259, 2005 WL 2143984 (N.D. W.Va. Sept. 1, 2005) (finding posthumous entry of QDRO enforceable due to eighteen-month segregation of benefits period required by ERISA); 29 U.S.C. § 1056(d)(3)(H)(i) (requiring escrow of amounts potentially payable to alternate payee during evaluation of QDRO). While federal law is not controlling, we find the analytical approach employed in *Ferrell* to be instructive. Addressing the distinction between an interest in benefits and an *enforceable* interest in benefits, the district court borrowed from the Ninth Circuit's reasoning to explain:

> ERISA does not suggest that an alternate payee "has no interest in the plan[] until she obtains a QDRO [;it] merely prevent[s] her from enforcing that interest until the QDRO is obtained." Thus, "a QDRO only renders enforceable an already-existing interest" and therefore "*there is no conceptual reason why a QDRO must be obtained before the plan participant's benefits become payable on account of his retirement or death.*"

---

[36]In March 2011, the Board increased Mrs. Akers' monthly payment from $1,247.51 to $1,561.44 and paid her a lump sum of $4,395.02 to satisfy the arrearage.

*Id. at \*4* (quoting *Trustees of the Directors Guild of America v. Tise*, 234 F.3d 415, 421 (9th Cir. 2000) (emphasis supplied and internal citation omitted).

At issue in *Ferrell*, was the effect of the ex-husband's intervening death between the issuance of a domestic relations order awarding his former spouse 100 percent of his retirement plan and the preparation of the QDRO required to enforce that right. Upon submission of the QDRO, the plan refused to accept the order on grounds that it was signed after the death of the participant.[37] The district court reasoned in *Ferrell* that the existence of the right giving the alternate payee plan benefits was not itself posthumous; instead, it was the attempt to enforce that right which was posthumous. 2005 WL 2143984 at \*5. Finding that distinction critical, the district court recognized the harsh results that would obtain absent a court's ability to enforce QDROs posthumously:

> If an alternate payee's right to ERISA plan proceeds were automatically cut off once an event occurred that, absent an enforceable QDRO, would make the proceeds payable to someone else, then a plan participant's retirement, the vicissitudes of court scheduling, or a plan participant's death, all events beyond the control of the alternate payee, could determine the parties' substantive rights. However, Congress [did not mean] to ask the impossible, not the literally, but the humanly, impossible, or to make a suit for legal malpractice the sole recourse of an ERISA beneficiary harmed by a lawyer's failure to navigate the treacherous shoals with which the modern state-federal law of employee benefits abounds.

---

[37]Because the ex-husband died without designating a death beneficiary, his children were eligible to receive his pension benefits by default.

*Ferrell,* 2005 WL 2143984 at *6 (quoting *Metropolitan Life Ins. Co. v. Wheaton*, 42 F.3d 1080, 1085 (7th Cir. 1994)).

Of further guidance to our consideration of this issue is the Ninth Circuit's conclusion in *Tise* that a posthumously-obtained order from state court that fulfilled all the crucial requirements of a QDRO was enforceable. *See* 234 F.3d at 426. In deciding whether the decedent's selection of a designated beneficiary could trump the state orders recognizing his former wife's right to his pension plan proceeds for a substantial child support arrearage, the appellate court surveyed the scheme of ERISA to observe that "whether an alternate payee has an interest in a participant's pension plan is a matter decided by a state court according to the state's domestic relations law." *Id.* at 421. Continuing its assessment, the court explained that "[w]hether a state court's order meets the statutory requirements to be a QDRO, and therefore is enforceable against the pension plan, is a matter determined in the first instance by the pension plan administrator, and, if necessary, by a court of competent jurisdiction." *Id.* In conclusion, the court reasoned that a QDRO is merely the vehicle by which a former spouse seeks to enforce an interest in a pension plan that has already been determined to exist.[38] *See id.*

---

[38]As the Ninth Circuit observed in *Tise:* "Through its QDRO provisions, ERISA elevates a plan participant's legal obligations, commonly to a former spouse or children of a previous marriage, over the participant's express wishes to provide for other individuals as designated beneficiaries." 234 F.3d at 425.

As part of its examination in *Tise*, the Ninth Circuit discussed *In re Gendreau*, 122 F.3d 815 (9th Cir. 1997), a decision in which it concluded that the state court, at the time of the parties' divorce, both created the ex-wife's interest in her ex-husband's pension plan and correspondingly limited her ex-husband's interest in that same plan. *Id.* at 818. When the payment order did not initially fulfill the statutory requirement for a QDRO in *Gendreau*, the court reasoned that the parties' interests in the pension plan proceeds were unaffected. All that was required to enforce those interests, as the court explained in *Tise*, was a "return to state court for a revised order that would pass muster as a QDRO." 234 F.3d at 421.

Based on our examination of this state's public retirement laws, we can find no basis for reaching the conclusion that a QDRO cannot be entered posthumously. *See Samaroo v. Samaroo*, 193 F.3d 185, 193 (3rd Cir. 1999) (Mansmann, J., dissenting) ("There is good reason to allow state courts some leeway in entering or modifying domestic relations orders even after a participant's death, or retirement, or other status-altering event."). Clearly, the model QDRO language anticipates and provides for the necessary continuing jurisdiction in the family court to **"**revise, modify, or amend this Order insofar as is necessary to establish or maintain its qualification as a QDRO**."** *See McPhee*, 980 A.2d at 1269 (recognizing authority to posthumously clarify QDRO for purpose of conforming order to intent of court's judgments); *Eller v. Bolton*, 895 A.2d 382, 395 (Md. App. 2006)

30

(approving trial court's posthumous amendment of QDRO to reflect parties' intent where court had retained jurisdiction over QDRO). Addressing the need for flexibility in dealing with the posthumous enforcement of a QDRO, the Tenth Circuit observed in *Patton v. Denver Post Corp.*, 326 F.3d 1148 (10th Cir. 2003):

> Courts in domestic relations contexts must have the power to effect equitable settlements by responding to newly acquired information or to changes in circumstances. If necessary changes once effected by the state court are not then recognized by plan administrators or by federal courts adjudicating disputes, state courts are effectively stripped of their ability to equitably distribute marital assets in a divorce.

*Id.* at 1154.

Accordingly, we hold that a family court has the necessary authority to posthumously enforce, revise, modify, or amend a domestic relations order for the purpose of establishing such order as a qualified domestic relations order. *See Griffin v. Griffin*, 753 S.E.2d 574, 583-84 (Va. App. 2014) (characterizing QDRO as administrative mechanism to enforce state-created rights through divorce decree and approving posthumous entry of QDRO). Because Mrs. Jones' proportional marital interest to Mr. Akers' retirement benefits had been established by the divorce decree that was entered prior to Mr. Akers' death, she is entitled to posthumously seek enforcement of her right to fifty percent of the retirement benefits earned by Mr. Akers during their marriage. *See Files v. Exxonmobil Pension Plan*, 428 F.3d 478, 491 (3rd Cir. 2005) ("Nothing in the statute, or in our precedent, requires that

31

a QDRO be in place prior to the death of a plan participant when the QDRO that is ultimately obtained . . . simply seeks to enforce a separate interest in a pension benefit that existed before the death of the plan participant."); *In re Marriage of Padgett*, 91 Cal. Rptr. 3d 475, 493 (Cal. App. 2009) (distinguishing between permissible posthumous enforcement of QDROs where interest sought to be enforced was created before death of pension member and impermissible enforcement of QDROs where right is created post-death); *cf. Samaroo*, 193 F.3d at 191 (refusing to permit wife to amend divorce decree nunc pro tunc after participant's preretirement death to provide for award of preretirement survivor's annuity that wife was not previously granted through divorce decree).

The decision reached in this case is impelled by our duty to oversee this state's domestic relations laws. Fulfillment of that most important responsibility requires us to superintend both the provision and enforcement of the equitable disposition of marital assets. If this Court were to prevent Mrs. Jones from obtaining a QDRO to enforce her entitlement to the largest marital asset she and her former husband had, we would be violating our charge to fairly administer the laws of this state. We find it noteworthy that even the Board, in rejecting the December QDRO, recognized the possibility of relief as a result of this appeal. While we disagree with the Board's determination that the December QDRO was unenforceable based on its posthumous presentment, we agree with the Board's conclusion that the QDRO was unenforceable due to the inclusion of the provision in

32

paragraph 7(b) providing for Mrs. Jones to be treated as the alternate payee for purposes of calculating survivorship benefits.[39] Accordingly, on remand Mrs. Jones is entitled to prepare and submit a QDRO that omits the non-conforming language of paragraph 7(b) and seeks only to enforce a fifty-percent interest in the marital asset of retirement benefits.[40] That award of benefits, provided a qualifying order is submitted to and approved by the Board, shall be prospective only.

## IV. Conclusion

Based on the foregoing, the July 10, 2014, order of the Circuit Court of Kanawha County affirming the award of disability retirement benefits to Mrs. Akers is reversed with directions that the matter be remanded to the Board for purposes of issuing a

---

[39]We reject Mrs. Jones' argument that the Board waived its right to raise the inclusion of paragraph 7(b) as non-compliant based on its failure to specify that deficiency in rejecting the June QDRO. The model QDRO clearly states that such provision is not permitted.

[40]The Board took the position during this appeal that had a valid QDRO been in place, upon Mr. Akers' death Mrs. Jones would have immediately begun to receive her fifty-percent marital interest in the retirement benefits with Mrs. Akers being awarded the remainder. While West Virginia Code § 5-10-27(b)(1) does not directly require an offset of a preretirement death benefit by the provisions of a QDRO, because such an award is made pursuant to West Virginia Code § 5-10-24, such an offset may arise through applicable regulatory provisions. We invite our Legislature to consider amending West Virginia Code § 5-10-27(b)(1) to permit the surviving spouse benefit to be awarded in whole or in part to another person by a QDRO. *See, e.g.,* Me. Rev. Stat. Ann. tit. 5, § 17852(5)(C) (2013); *but see* 40 Ill. Comp. Stat. Ann. 5/119(b)(4) (West 2013) ("A QDRO shall not apply to or affect the payment of any survivor's benefit, disability benefit, life insurance benefit, or health insurance benefit.").

preretirement death annuity to Mrs. Akers.[41]  With regard to that same ruling, the decision of the Circuit Court affirming the Board's denial of retirement benefits to Mrs. Jones on grounds of two unenforceable QDROs is affirmed, but the matter is remanded for preparation of a third QDRO for submission to the Board that complies with the statutory and regulatory requirements by solely seeking payment of the fifty-percent marital interest Mrs. Jones acquired to the PERS benefits of Mr. Akers.  All of the relief awarded shall be prospective only.

> No. 14-0734: Affirmed, in part;
> Reversed, in part; and Remanded;
> No. 14-0764:  Reversed and
> Remanded.

---

[41]That award of preretirement death benefits will be subject to a QDRO entered for the purpose of enforcing Mrs. Jones' fifty-percent interest in the marital asset portion of the annuity.